Well, our first case, it's 24-3067-24-3116-24-3146 Sandoz Rare Gen v. United Therapeutics Corporation. Mr. McLeod, it's a tough act to follow, but whenever you're ready. I'll do my best, General. Thank you, Your Honors, and may it please the Court, Charles McLeod of Williams & Connolly on behalf of UTC. With the Court's permission, I'd like to reserve 10 minutes of my time. Sure. The decision below converted the settlement of a routine patent dispute into a one-sided windfall for Sandoz. That conversion depended on over-reading key contract language, accepting unreliable testimony from an expert who failed to do basic due diligence, and ignoring New Jersey's clear prohibition on awarding unforeseeable damages. For these and other reasons, the Court's decision regarding breach and liability cannot stand. As to the antitrust and state law claims, however, the District Court correctly recognized UTC's actions for what they were, routine competitive conduct that actually benefited competition. Now help me understand how it benefited competition. My understanding is that your agreement with Smith almost, I say almost, maybe that's your answer, almost precluded anyone other than UTC from distributing the drug at issue here because of the device necessary to administer it simultaneously. So I have two responses to that question, Aaron. The first one is the one that you suspected, which is our agreement with Smith did not foreclose competitors from doing anything. As the District Court made clear, a competitor, an efficient competitor, would have multiple options available to compete with UTC. I can list them off. Well, how quick it is. It couldn't administer the drug subcutaneously. It could still do it intravenously, but it couldn't do it subcutaneously. And most of the market, as I understand it, is to the subcutaneous administration. 60%, Your Honor. Okay. How many, 50? 60. 60, okay. And the rest is the intravenous. Okay. But the reason that a competitor could still compete is they would have options available to come up with, one, a competing cartridge. That's what Sandoz ultimately did. They worked with Care Life, a competing manufacturer, to come up with a different cartridge. Another option would be to work with Smith's. Our agreements with Smith's permitted Smith's to be paid to make additional cartridges for other companies. Smith's also actually- Your instructions to the pharmacies specifically say that the cartridges would probably not work with anything other than Rimaldan? No, Your Honor. We told the pharmacies, with respect to the cartridges who we had paid for and funded, not to use those with any other drug except Rimaldan. But we never told the pharmacies that they could not use alternative cartridges to dispense the Sandoz generic product. So Smith's went up to what, from 2.1 to 2.8 million cartridges? Is that correct? Yes, Your Honor. And basically you had a claim on, what, 2.1 after the amendment? Or was it 1.6 to, what, 2.1? It was 1.7 and then to 2.1 to 2.8. And our claim was on all of them because the evidence showed that we needed all of those cartridges in order to serve our own patients. But if you're going to have one method that requires cartridges for giving this particular generic drug by Sandoz, then how are they supposed to get that? Well, Your Honor, this goes back to my answer to Judge McKee's question, which is they had three options available to them. The first was to work with the alternative. But they were told by a credo that don't worry about it. In 2015, 2016, we'll be able to cover you. It turns out that there was an issue there. Smith saw the issue. That's one of the reasons they increased the number. But it looks like there was maybe, arguably, an intent to corner the market, and it didn't happen. And then an intent to try again, and it didn't happen because a credo got cold feet in December of 2018. And then Smith got cold feet when they got a letter from Sandoz threatening antitrust action in February of 2019. But by March of 2019, you had the full allocation, and nobody could get anything other than with your permission. So you, in effect, were a monopolist, were you not? With respect to the cartridges we had funded and paid for, yes, we own those cartridges, and no one else could use them to deliver their drug. But the critical piece here, and the reason there can be no foreclosure on this record, is that Sandoz retained the option to come up with alternative cartridges. It could have, as I said before, worked with a competing manufacturer to come up with different cartridges. It could have worked with Smith to pay for its own cartridges and done what UTC did. They ultimately did, right? Exactly. And it was a process that cost them $500,000. They were able to quickly get that onto the market. And on the facts of a case like this, that is strong evidence of no foreclosure. A number of courts have rejected the premise, which I think sort of underpins their argument. Does it actually mean no foreclosure? What if the market is so restricted and restrained as to substantially undermine the ability to make a profit? Would that be sufficient foreclosure? That could be. So if they had come up with evidence to show that getting onto the market would be so expensive or so laborious that they would never be able to make a profit, that could be evidence of foreclosure. The record here is- But my question wasn't never making a profit. They could make a profit, but the profit would be greatly reduced from what it would have been absent the monopolistic conduct. That could be evidence of foreclosure, but the record here is completely different. The record shows that it was a de minimis cost. It was $500,000 to develop these alternative cartridges. It was not a complicated process. Their argument is essentially if we can't get on the market immediately, as soon as we want to get on the market, then we have been foreclosed. But there is no case that holds that they are entitled to be on the market at a particular point in time. The question instead is whether they could be on the market in a reasonable amount of time. And here they were able to get on the market in about two years, and again, at a cost of about $500,000. And courts around the country have found that when you have that kind of opportunity to compete, there can be no finding of foreclosure. I point in particular to the Qualcomm case from the Ninth Circuit and the Continental Airlines case from the Fourth Circuit, both of which considered similar sort of arrangements, obviously not involving cartridges, but found that the opportunity to compete was inconsistent with a claim of substantial foreclosure. And the foreclosure analysis, I think, really resolves the rest of the antitrust claims. Now, of course, the district court proceeded through the rest of the rule of reason analysis, and we think that the court was right on each of those issues. But if the court agrees that there was no foreclosure, there can be no Section 1 claim or Section 2 claim, and the court doesn't have to proceed through the rest of the antitrust analysis. UTC claimed it was worried that the remodeling patients wouldn't have enough cartridges without brand exclusivity. But why would the entry of a generic make it so remodeling patients couldn't get cartridges? Because the number of patients stays the same, does it not? That's right. So if the demand stays the same, then all you're really talking about is some patients may wish to switch to the generic perhaps for pricing reasons. Isn't that correct? That's probably not factually correct on this record, because very few of the patients actually pay anything out of pocket for this product. So there's actually not that sort of financial pressure to switch. But I take the point that, you know, luckily, the pool of these patients is not expanding. It's a very small market. But what the evidence shows is the reason that we were so concerned about supply is we underestimated the rate at which our own patients were going through the cartridges. That's why you see the increase in the number of cartridges from 1.7 million to 2.1 to 2.8 million, because we realized that patients were burning through the cartridges much more quickly than we expected. And so we were concerned, very concerned, that if we didn't increase the supply of cartridges, we would not be able to serve our own patients, setting aside the question of whether Sandoz could benefit from the cartridges that we were funding. Go ahead, I'm sorry. That was what motivated that decision to increase the number of cartridges in the group of Smiths. And isn't it true that Smiths announced that it was going to discontinue these cartridges prior to the settlement? Exactly. And so as soon as that happened, we began working with Smiths to fund the creation of these new cartridges to extend the life of the system. It's undisputed that Sandoz learned of that discontinuation in 2016. And so Sandoz had numerous opportunities available to it, even prior to the 2019 restrictions, to try to come up with some alternatives. Instead, as George Ambrose alluded to, they simply assumed that there would be cartridges available. They never did anything to verify that assumption. And then even in 2019, when they realized… The testimony was that a credo told them that they would. And also they attempted, I think, to put in an expert report of Mr. Lankow, saying that the reasonable company in that position would have assumed that there would have been enough supply to meet demand. So, Your Honor, I think the standard is, again, a reasonable company. And a reasonable company, even assuming that they are right about not needing to act until 2019, had a number of options available that would have enabled them to compete. We never foreclosed the specialty pharmacies from working with Sandoz. We never told the specialty pharmacies… The specialty pharmacies, I didn't hear you. We never foreclosed the specialty pharmacies from working with Sandoz. We never told them, you cannot use any cartridges but our cartridges. The restriction was, for the cartridges that we funded, you cannot give them to this other competitor company. And the cartridges don't work with anything else, do they? Yes, these cartridges can be used for other drugs. That's another reason why we realized we needed more cartridges. …specialty pharmacies, specifically, was that the cartridges would not work with anything but your product. No, Your Honor. So, we never said that they wouldn't work with another product. And, in fact, one of the reasons we had to increase the supply is because the specialty pharmacies were distributing cartridges for treatment of other conditions aside from TAH. This is before Sandoz was even in the picture. And so we realized we needed way more cartridges than we had initially anticipated, again, because of the burn rate and because of the leakage of cartridges. Didn't you tell the pharmacies that they couldn't…that Sandoz couldn't use these cartridges for their product? Yes, for the cartridges. That's what I referred to. We said you can't use them for the Sandoz product. But we never said you cannot use other cartridges that Sandoz might develop. But the cartridges were out there at the time. So, at the time, they had the option to work with competing manufacturers. They also could have worked to develop an entirely new pump system. That's what UTC initially did when it began working with Smith's. The Smith's pump that's at issue was initially used to deliver insulin. And so we worked with Smith's to customize that and allow it to be used with free prostate milk. So that was an option that was available. There were, it's undisputed, there were pump systems that were on the market here and in Europe that could have been used, that could have been customized. And that was a project that would have cost a couple of million dollars and taken anywhere between 18 months and two years. So, again, I think the fundamental point on the foreclosure analysis is that there were a number of options that would allow competition. And what the antitrust laws focus on is whether competition itself has been destroyed. It's not a question of whether Sandoz was impaired or whether any particular competitor was impaired. It's whether there were options to compete. And it's undisputed on the record that they had multiple options available that would have allowed them to effectively compete. What do you make about the evidence of a senior director at EquatIO who said his understanding was that your client's purpose for restricting cartridges was to, and I'm quoting, to block the cartridges from being used with generic triprestinol and to prevent EquatIO from using these cartridges with the generic triprestinol, I'm sure I'm not pronouncing it correctly, that was about to be launched. So I think that evidence is ultimately irrelevant because, again, the question is whether there were options available to compete. And even if our intent had been to, you know, block the generic, there were still options available that would have allowed the generic competitor to come to market, as Sandoz, in fact, did. The other point I would make with respect to that issue is, as the district court found, there were multiple pro-competitive reasons that we gave for these restrictions, including the need to secure supply for our own patients. And securing supply, ensuring output, especially for these critically ill patients, are classic pro-competitive benefits. That's why these sort of exclusive dealing arrangements are generally considered to be highly pro-competitive. It's only where there is a finding of substantial foreclosure that you have a problem with respect to the antitrust laws. That was the issue. I don't understand the additional resin. Maybe I should ask Sandoz. But Smith, at one point, attempted to acquire a different additional resin. And I don't understand, one, what that is, how that feeds into the supply of the mechanism for delivery. So you need the resin in order to make the cartridges that go into the system. And so the dispute I see… It is not the pump. It's not the pump. They're used to make the cartridges. And I think the argument that Sandoz made was that that decision to try to secure additional resin was made independent of UTC by Smith. The record actually shows that UTC was the motivating factor in the process all along. We are the reason that Smith initially agreed in 2015 and 2016 to try to make more cartridges. We are also the reason why they sought additional resin because, again, as I said before, we realized that we were running out of the cartridges much more quickly than we expected. And that's why we had to amend the agreement in 2017 and ultimately again in 2019 in order to ensure there would even be enough cartridges for ourselves to use. And the goal – if you are Sandoz and you're being told that there will always be enough cartridges by the primary supplier, the person who supplies – or the pharmacy that supplies 80 percent of this particular drug, and you find out in 2019 that that may not be the case about this very same time that you're beginning to put that drug on the market – I guess nine months late. They were going to initially do June of 2018. This is now March of 2019. How could a reasonable alternative be found quickly to deal with that situation, which appears to have come on them like a crisis? So, Your Honor, I think where I disagree with the premise of your question is that they needed to be able to get onto the market quickly. The question is whether they had an opportunity to compete. They had multiple opportunities available to come up with alternative cartridges, and they could have done that right away. As soon as in 2019 they learned they were not going to be able to get these cartridges, they could have worked with a competing manufacturer to come up with alternative cartridges. Who was the competing manufacturer other than Smith's? Carewife. I mean, that was the one they ultimately used. There were a number of other manufacturers available. This is not a complicated process to get these cartridges created. And so I think it was incumbent on them to actually compete rather than trying to sit around and see if they could just go to the courthouse. The point of the antitrust laws is to encourage competition. Now, that's ultimately what happened here when they decided to work with Carewife. But there was a significant period of time when they were doing nothing, essentially, in order to secure the supply because, as you suggested earlier, they had to rely on these assumptions. And with respect to Acredo in particular, it is true they distribute the cartridges, but they were not the cartridge manufacturer. I think it would be incumbent on the part of a manufacturer like Sandoz to talk to Smith's and say, do you think there will be cartridges available? The final point I would make on this is it's undisputed that Sandoz was aware that we had an arrangement with Smith's with respect to the cartridges and pumps. And so if there was any doubt that we were trying to secure the supply for ourselves, I think it would have been dispelled by that knowledge. I think Sandoz's position is essentially they assumed that even though we were paying for all of these cartridges to be made, we were thinking of them as well and planning for them to benefit from our diligence with respect to the cartridges. And that's not an assumption that any sort of reasonable competitor would have made. A reasonable competitor would have prepared themselves. I'm trying to think what I would do if I was back 2015, 2016. I probably would have gone to Acredo first and say, you're going to have enough for us? And Acredo says, yes. So are you saying that they also should have double checked and gone back with Smith's and said to Smith's, OK, in a couple of years, we know we're going to need these. Are you going to have enough for us? Is that what you're saying? Absolutely. I think that would be a critical thing to do to verify. And again, that's exactly what UTC did, because we knew that we had a responsibility as the manufacturer of the drug to ensure that we could deliver the drug to our patients. So we worked right away with Smith's to come up with the alternatives. We did not simply assume that there would be a supply of the cartridges available. So, yes, I think it was incumbent on them in 2015. Now, I don't want to fight Your Honor too hard on that, because I think, again, if you assume they had no reason to act until 2019, there is still no basis to find foreclosure, because even in 2019, they had alternatives available that would allow them to compete, not right away, but to compete in a reasonable time and at a reasonable expense. What was that? Was that Care Life? That was Care Life. That is the option they ultimately used. There were two other options. One would be to work with Smith's. They have acknowledged that our agreement with Smith's did not prevent Smith's from working with Sandoz. And in fact, Smith's sent Sandoz a license that said, here, you can license our cartridge design and have someone else make it for you. And Sandoz turned that down. They said, well, we want that, but we also want an interim supply of cartridges. But a reasonable competitor could have simply said yes to the offer and gotten on the market much quicker than Sandoz actually did. The final option that was available, and I've referenced this before, was to work with alternative pump manufacturers. So Smith's is not the only company that makes these pumps. The reason the pumps are relevant is because you could make different pumps that use different cartridges. And they got a quote from a manufacturer that said that it would be a couple of years and a couple of million dollars in order to do that. So that was a third option they had available to compete. So for all of these reasons, I think there could be no finding of foreclosure. I do want to say I see my time. No, go ahead, because you haven't addressed the breach of contract. Why don't you tell us, give us your position on the breach of contract. Sure, certainly, Your Honor. And so with respect to the breach of contract, I want to start by just reiterating the standard that applies at summary judgment. The question for the district court was not whether Sandoz had good interpretation or even the best interpretation. The burden on Sandoz was to show that it was the only reasonable interpretation of this agreement. And I don't think Sandoz can meet that burden when you consider the text of the agreement, the context of the agreement, and the consequences of Sandoz's interpretation. Doesn't the district court have to consider whether or not there's an ambiguity? Myelin is the case I'm thinking of. Determine whether or not there's an ambiguity in the contract? The court never did that, did it? So the court found that it was unambiguous in Sandoz's favor. And we think that… It never considered an alternative explanation or interpretation, though, did it? It did. It rejected our alternative explanation. We think that was wrong. We think, at a minimum, our alternative explanation of this agreement, which is a much more modest explanation, is plausible, especially, again, when you consider the text, the context, and the consequences of Sandoz's interpretation. I see my red lines. No, go ahead. No, no, you're good. Thank you. So with respect to the text, the agreement contains express restrictions that say that Sandoz did not receive any rights to pumps or cartridges or any other delivery devices. Those restrictions are written to the agreement three times. That's how important it was for the parties to make clear that as a result of this agreement, Sandoz was not getting any rights to these cartridges, which were already in short supply. The agreement, I think, is also critical to understand in the context of the settlement of the patent dispute. So at this point in time, UTC was winning the patent case. UTC's patent had been found to be valid and infringed. And the consequence of the district court's interpretation is that Sandoz actually gets a significant benefit it couldn't have gotten even if it had won the patent case. It gets access to these cartridges that we otherwise would have no obligation to share with them. You know, these were, again, our cartridges. We were trying to fund them exclusively for our own patients. And that leads, I think, again, to the consequences of this agreement as interpreted by the district court, which is it effectively makes us a guarantor of the success of our competitor, even though the entire purpose of the agreement is to enable competition between UTC and Sandoz. So for those reasons, we think that the interpretation that we offered is at a minimum plausible. And that's all that's required to go to a jury on these questions. Your reply brief on page 12 said that you argued that your client, quote, But you actually didn't get a contract of that kind until 2019, did you, in terms of in real fact? So that was a disputed fact. And we think that that's another reason why summary judgment on this record on the breach claim was inappropriate. Our perspective was from the very beginning, there was an expectation and understanding on the part of both UTC and Sandoz that the cartridges would be exclusively for UTC. The very first agreement says we're going to make these cartridges. All of the excess goes to UTC. And so that was consistent with our view that this was an exclusive arrangement. What changed in 2019, and I think this is what your honor is alluding to, is we took actual legal title to the cartridges in 2019. But from our perspective, that did not change the fact that this had been an exclusive arrangement even prior to that point. So I think that is a sort of factual dispute that a jury should have been given the opportunity to resolve with respect to the breach claim. I do want to note for purposes of the antitrust claim, you can assume I'm wrong about that. You can assume that we didn't have exclusivity until 2019. And it doesn't change the analysis for the reasons I've been discussing with your honor before. Because even in 2019, there were options available for a competitor to get onto the market in a reasonable amount of time. If we were to reverse the district court on the summary judgment as to liability on the breach of contract claim, what happens to the evidentiary and damage award issues? I guess they have to, we should still weigh in on those, should we not? We would appreciate the court's guidance on that, particularly with respect to the testimony of Dr. Jenna. Because I think otherwise the trial that happens is going to look very similar, at least with respect to damages. And if I might quickly say a couple words on Dr. Jenna. So, you know, this court in VF Meritor made clear that an expert needs to understand the reasons and assumptions underpinning someone else's data. If you're going to rely on that to create your hypothetical world. And Dr. Jenna failed to clear that hurdle. I want to make clear the problem is not just that Dr. Jenna didn't know the name of the person at Raritan who made the forecast, although he didn't know that. It's that there were critical assumptions underpinning his own analysis that he failed to verify in the forecast. And perhaps the clearest example I can give the court is with respect to the halo effect. So recall that the halo effect is Dr. Jenna's explanation for why he says IV sales were depressed, even though the IV was available to everyone. And it accounts for about $50 million worth of Dr. Jenna's damages award. Well, during his deposition, my colleague asked Dr. Jenna whether he knew whether the halo effect was incorporated into the Raritan forecast. And Dr. Jenna said that he had no information one way or the other. He just assumed that it would be incorporated. If Daubert and 702 mean anything, it's that experts cannot simply assume critical aspects of their opinion. And yet that is what Dr. Jenna did time and time again. I would really encourage the court to read Dr. Jenna's deposition testimony on this, particularly the point I just referenced. It's at Appendix 4513 through 4514. And he says over and over again that there is key information about this forecast that he was totally unaware of and made no effort to investigate. So for that reason, we think that his analysis was unreliable and inadmissible. So should we send it back to reconsideration or should we preclude him from testifying? We would ask you to preclude him from testifying because we don't think that he can repair. He formed this opinion at a time when he didn't know anything about this forecast other than someone at Raritan had made it. And so he can't get more reliable now. You know, it's a little too late for that. So we would ask you to preclude his testimony. The last piece of guidance I think we would ask the court to offer. On this one, excluding the testimony of Dr. Jenna, wouldn't it be better if he just got more up to speed the next time around as opposed to being unaware in the past as to what was the basis for his claim? I'm not sure he could actually do that, at least not without doing an entirely new report and new discovery on that report. I think generally parties are given one bite at the apple on things like this and he failed to meet his burden. I do think they would still be able to try to put together a damages case based on the evidence in the record. That's actually what happened in the ZF Merger case. The court excluded the expert but said that there was sufficient evidence in the record from which that party could nevertheless come up with an alternative damages theory. So I think that would be the option available to them. So if it goes back, I was thinking you were saying it would be a blank slate on damages and evidentiary issues. But you're saying some of those issues you want us to, in effect, make a call as to whether somebody can testify. At least with respect to Dr. Jena, Your Honor, I think there are other evidentiary issues we raised that we would be comfortable having the district court reconsider. But Dr. Jena's analysis was critical to the case. It was really the centerpiece of their damages case. And I do think it's important for the court to offer guidance on whether what he did was appropriate or not. The last thing I would suggest that the court offer guidance. You're asking for more than that. You're not asking for guidance. You're asking us to preclude it, right? Correct. That's right. The last thing I would ask the court to resolve with respect to the damages is this issue about foreseeability and whether Sandoz can recover unforeseeable damages. The district court acknowledged that the testimony showed the halo effect. Again, this difference between sales in the IV world without subcutaneous and with subcutaneous. The court acknowledged that was unforeseeable. There was testimony at trial from Sandoz witnesses saying they didn't know in advance whether there would be any impact on IV sales from the restriction on subcutaneous cartridges. And we think it's clear under New Jersey law that foreseeability is a requirement to recover damages. The district court disagreed. It said there was no foreseeability requirement imposed by New Jersey law. But the very case that it cited, the Totaro case, says very clearly that damages are not recoverable if they're not foreseeable. And I think Sandoz has acknowledged that the district court was wrong, at least in that respect. Their argument is, while there's a foreseeability requirement, but it's sort of general, it just requires you to show that a category of damages was foreseeable. I think that's inconsistent with Totaro, which performed a pretty granular analysis of what lost profits could be recovered. It's also clearly inconsistent with the Onyx Acceptance Corporation case that we cited from the Superior Court that, again, says you can recover some of these damages for some of these customers, but not these damages for other customers. And we think that a similar analysis has to be applied here where it's clear that the halo effect was not foreseeable. Unless the court has other questions, I'll reserve the balance of my time if I have any for rebuttal. Sure, you have 10 minutes. Thank you, Your Honor. Mr. Kent, good afternoon. May I proceed? Please. May it please the Court. Matthew Kent from Alston & Byrd on behalf of Appley, Sandoz, Inc., and CrossAppel and Sandoz, Inc. And I'm joined today by Ms. Kathleen Hartnett of Cooley to counsel for Rare Gen. Your Honors, I'll be addressing the breach of contract issues and Ms. Hartnett will be addressing the antitrust issues. So why don't you start with language in 4I and 7A and tell me how we should read that language in terms of the cartridges. Certainly. And I'll actually also include 13C as well. So there are three provisions in the patent settlement and license agreement between UTC and Sandoz that talk about pumps. There's four, I believe it's 4L and then 7A as well as 13C. Each of those do something that is unremarkable in a patent settlement. They just make it clear that Sandoz doesn't give a license to proprietary technology. And there are actually two proprietary technologies that are listed in each of those provisions. One of them is the remodeling implantable pump and the second is the DECA pump. At this time, and the record is undisputed, UTC had a number of pump projects in the works, but they were unable by 2019 to have any of those pump products come to fruition. The two that are listed in this patent settlement agreement are just two. There were several others as well. All that provision does is say Sandoz doesn't have a license to that technology. What it doesn't do is undo and rewrite Section 11B. So Section 11B of the contract as well as 15A, which are the provisions that were breached by UTC's conduct here, are very clear and they're very broad. And specifically, if you look at 11B, it says that UTC promised not to take any action, directly or indirectly, to prevent, delay, limit, or otherwise restrict the launch or sale of Sandoz's generic products. Your Honor, prevent, delay, limit, restrict. Beg your pardon? It also includes distribution and the things that it's not going to need not to interfere with. Correct, Your Honor. It is very broad. The provision was intended to protect Sandoz. That doesn't preclude Sandoz from finding delivery mechanisms other than what UTC had, right? It doesn't preclude Sandoz from finding other delivery mechanisms, but of course the question of the breach of contract circumstances, whether or not UTC's conduct violated the plain language of the agreement. And UTC ultimately tries to essentially say that by somehow in those provisions in 13C and in 4L and in 7A too, that say you don't get a license to UTC's proprietary technology, that that somehow allows them to gobble up all of the cartridges on the eve of Sandoz's generic launch and then restrict those cartridges only for use with UTC's product. That, Your Honor, is the breach, and that is the clear violation of 11B. Was there an alternate manufacturer at that time in March of 2019? No, Your Honor, and I want to be clear because Your Honor asked that question to UTC's counsel. The answer is there were no alternative cartridges available, which effectively blocked Sandoz from the market for more than two years. And contrary to counsel's representations to this court, at trial there was extensive testimony from Mr. Mumaw about exactly how, immediately when Sandoz and Raritan found out about the block, they went to work to try to find an alternative cartridge. They worked with Care Life. They brought an alternative cartridge to market, but that took more than two years. And so here – What do we make of the fact that Smith announced prior to the settlement agreement that it was discontinuing the pumps or the cartridges? So to be clear, Smith's notice of discontinuation back in 2015 said two things. One, it said that they were no longer going to be making the pumps, but it also said that they were going to be making the cartridges for at least three years. And as Judge Amber had pointed out to UTC's counsel, Sandoz had gone to Acredo and they had gotten assurances from Acredo that they had everything that was needed in order for them to come to market with the product. And I'll get to that. The shelf life, and maybe help me with this, the shelf life, that is pretty remarkable. Is that on the cartridge or the pump or both? So the shelf life for the pump can last up to ten years, and I do want to be clear. We presented evidence at the trial court that there were more than 3,000 unencumbered pumps that could be utilized with Sandoz's product. That was enough to service every patient who was being served subcutaneous proprosanol at that time. And as a result, when Sandoz and Rogen were coming to market and they spoke with Acredo and they got assurances from Acredo that ultimately they had the cartridges available, and the testimony on that is Appendix 1347, Your Honor, and the testimony that Acredo owned more than 3,000 unencumbered pumps, that's in Appendix 5381. Now both of those are critical because what happens is Sandoz has done its diligence. It has done its work. It's ready to launch the product. And then on the eve of that launch, that's when everything falls apart because UTC realizes for the first time it doesn't have restrictions on those cartridges. Now UTC and its counsel, and they said it's open. There's a distinction between the cartridge and the pump, correct? That is correct, Your Honor, and this is not a problem with the pump. It's a problem with the cartridges. Only the cartridges and only the cartridges that were manufactured and sold by Smith Medical for decades to the specialty pharmacies completely unencumbered. And here's the thing that UTC says, and they said it again in the oral argument today, and so I want to look, cartridges UTC paid for and funded. Cartridges UTC paid for, let's be clear, they never took title to a cartridge. They never purchased a cartridge. They never did any of that until 2019 when they gobbled up all of those cartridges from Smith Medical, and then guess what they did? They entered into those two restrictive agreements, one with ACREDO and one with CDS, to say you can only use these cartridges with UTC's remodeling product. That is the breach. It did not occur in 2016. It did not occur in 2017. When you look at those agreements, those agreements are making sure that there are pumps, proprietary pumps. Sandoz has never claimed a right to any of those pumps. What it does claim a right to and what 11B protects Sandoz from is being blocked by UTC's conduct. By having a situation where, again, in the language of the contract controls here, not to directly or indirectly prevent, delay, limit, or otherwise restrict the launch, that is exactly what UTC's conduct did here. And the temporal component is important to this court's analysis because, again, while UTC wants the court to believe that it had rights to these cartridges in 2016, that is simply not supported by the record. No reasonable juror could find that. Now, can I just, one question I have. The 2015 settlement agreement related to a patent dispute. Is that correct? That is correct, Your Honor. So why did the settlement agreement, in your understanding, go further than the patent dispute as to who has rights to the patent to what are you going to do about the generic? Your Honor, I don't think that we have to look behind the curtain, so to speak, because the language is clear and ambiguous in 11B. But what I'll tell you is that this is a bit of an unusual provision in a patent settlement. And I think when you look at and think about the context of it, Sandoz is essentially agreeing that it's not going to launch until August of 2018. That's the entry date that's agreed to by the parties. But they also want to make sure that UTC isn't going to do anything. There's not going to be any funny business, any chicanery, any rigging of the market in a way that would be inappropriate, and that's exactly what Section 11B does. The only reading in this room that is absurd is the reading that UTC is putting forward, that somehow 11B doesn't mean anything, and that by having a provision that makes it clear, again, a broad provision, directly or indirectly, not to delay, impede, restrict the sale or distribution of Sandoz's generic launch, that is the only reading that doesn't make sense. Now, I do want to talk about a couple things related to the intent here. As Your Honor said, the record is replete with evidence of exactly why UTC did this and exactly as it relates to the time. And so what's clear is that UTC's actions ultimately prevented Sandoz from serving 60% of the patient population. They were completely foreclosed, completely foreclosed 100%. If they could get into that market. I mean, again, the number of people with PAH is static for the most part, is it not? That is absolutely correct, Your Honor, and Your Honor also correctly pointed out to UTC's counsel that the number of cartridges that were utilized, it doesn't matter whether you're prescribed branded product or generic product, you need the same number of cartridges. So the idea that somehow people were concerned about this and that it suddenly became a concern on the eve of generic launch, such that UTC needed at that point to buy all of them up and restrict them, that's just nonsense. It's a breach. But wouldn't it be the counsel's argument that you had at least three alternatives out there to get a delivery system going? Including going to Smith's. I'd like your answer to that. That's false, and the reason that that's false is first, when Smith's and Sandoz started discussing the potential for licensing in January of 2019, there was a problem. There was no resin available. No resin, no cartridges. You actually have to get a new resin supplier qualified, go through the FDA approval process, which is what Sandoz and Raregent ultimately did with Care Life, but that took more than two years from January of 2019 all the way to April of 2021 until we were able to get on the market. So that is not an option. So you're saying the fact that you ultimately seceded to Care Life is irrelevant because of the critical time. You couldn't have done that because of the absence of resin? That's exactly correct, Your Honor, and the important thing there is that from a breach of contract perspective, that provides us the parameters for the timeline for Sandoz and Raregent's damage, right? So that's the damages period that Judge Martinotti looked at in the three-day bench trial, and then from an antitrust perspective, that was the time period that we were completely foreclosed from servicing those subcutaneous patients. So that's critical. Another pump, we already heard, even UTC's own counsel says that that would have taken years and millions of dollars. The best evidence of that is probably UTC's own failed efforts to bring other pumps to market. Let me back up to the resin shortage for a minute. Is that something that Sandoz could have anticipated and should have prepared for before they decided to go down this road? No, Your Honor, and I'll tell you why. As a generic manufacturer, and one of the really critical things here is that when we look at the record and about what Acredo told Sandoz, it said all you have to do is provide the proprosinol vials, and that made perfect sense because Acredo and CVS for decades have been purchasing the cartridges from Smith Medical, it's a third party, and have been utilizing those. And, again, it's that December 2018 when they start realizing, UTC realizes that none of these cartridges are restricted, that then you see UTC go into action to purchase them all and then restrict them, and those are the breach. Now, the alternative pump is not an option. It obviously doesn't provide an ability to go to market. The Smith Medical license is not an option because, ultimately, that, there's no resin, so there's no additional cartridges to be made. And, again, those facts, undisputed in the record. But what is also undisputed is the significant impact that it had here. And I want to talk about two things. First, I want to address the Dr. Jenna issue and the ZF Meritor, and then I want to turn, with the Court's permission, to the lost profits analysis, which we contend is, one, the only area where the district court erred on the breach of contract claim. Ms. Hartman will deal with the antitrust issue. So first on Dr. Jenna. Dr. Jenna actually testified extensively at trial, and Judge Martinotti was able to evaluate his credibility. He was able to explain exactly how he used the forecast. The only question at trial was the amount of generic Sanderson Rare Gen would have sold in the marketplace. And so he explained how he utilized academic literature, how he utilized other generic launches that had gone before, how he utilized UTC's own internal projections, how he utilized market analyst projections. Who did the other generic launches of? Were they of a similar amount? It is a very, very unique. There was only one other generic that launched, Teva, and they did not have a subcutaneous option either, which shows you that the entire market was entirely foreclosed. If Teva had had an alternative ability to come to market and serve as a subcutaneous patient. By the way, it wasn't foreclosed for intravenous, right? That is correct, Your Honor. So why was intravenous even part of the equation for damages? So the way that this product works is that patients go from being on subcutaneous to IV. So as patients get more sick, they need to be then transferred to the IV. And the reality is when you have a situation where you're blocked from serving the preferred route of administration, 60% of the patient population is subcu, those patients then shift to be IV. But here's the thing that was presented at trial, and there was a mountain of evidence about this. The fact that Sandos and RareGen were blocked from serving that preferred method of distribution of serving those patients made it to where the payers couldn't require physicians to dispense the generic product because there was no code available. And so there were all these administrative feasibility. It also gave the physicians and patients questions about the safety and efficacy of the generic because why isn't the generic available for the preferred method of distribution? And then finally we had the specialty pharmacy. The answer to that is easy. There weren't cartridges for the administration. That's correct, but unfortunately given the patient population and, again, the understanding physicians are not, again, in the process of knowing exactly what the issues are with drugs. But I think the payer issue is the most significant one. There's also a document that UTC admitted at trial that explained that 26% of the doctors were waiting until Sub-Q came to market to prescribe IV. That tells us about the halo effect. That tells us that it's foreseeable. And here's the thing about foreseeability. UTC wants to take – and I see the red light, but I'd like – thank you, Your Honor. UTC wants to take a hyper-specific granular focus on foreseeability, and I want to flag a few things for the court. First of all, Judge Martinotti in footnote 27, which is his footnote dealing with foreseeability, he explicitly rejects UTC's recasting and says that he finds that the damage as it relates to Sub-Q and IV was foreseeable, and it makes sense that it was foreseeable, and it makes sense that it was in the contemplation of the parties at the time of the contract, and here's why. UTC was an expert in the space. It knew the doctors. It knew the patients. It knew the drug. And it knew the relationship between Sub-Q and IV. And so did Sandoz. Sandoz is a sophisticated pharmaceutical company. It knew both of them, and they entered into the settlement agreement. And so, of course, if your launch for the preferred method of administration is blocked to 60%, that is going to have an impact on your overall launch, especially in a situation here where it impacts the payer's ability to prefer or mandate the generic. It impacts the physician's desire and ability to prescribe. And it impacts, again, the patient's. Doctor, if the IV treatment is as effective, if not more effective, than the Sub-Q, is that right? That is correct, because as the patients progress, they go to the IV treatment. But here's the difference between the IV treatment. Again, this is in the record. Dr. Forfia testified of it. Dr. Ginn testified of it. The Subcutaneous pump you wear on your belt. It's a small pump. It goes directly to the needle into the skin. It's an insulin pump. The IV pump requires a medical procedure. You have to get a catheter directly into your heart. Now, I don't know about you all, but I probably wouldn't want to have a procedure and undergo that to have a catheter put directly into my heart if I could wear a little pump on my belt. Now, and that's why, again, when you look at it, and this was all presented at trial, the reason that the Sub-Q is the preferred method is there's not that dangerous risk of a deadly blood infection as a result of having to do that surgical procedure. I want to talk about Dr. Ginn and the ZF Merger because I think, again – I'll just ask one question with Dr. Ginn. What justification did he give for pairing real-world pricing with forecasted generic penetration rates? Certainly, Your Honor, and I believe you're specifically talking about footnote 32 of the district court's decision. In a world where we have a situation where there's been a block, where the launch has been infected by UTC VAD conduct. I called it poison at the trial. In that situation, the thing that we're really looking at is how much generic Sandus would have sold. So that's the one variable that everybody is disputing. And here's the critical thing. Dr. Ginn looked at the real-world prices because the real-world prices were available. They told us what competition would bear and how that competition would react. Dr. Nicholson – and this is really critical – he was paid a lot of money by UTC's counsel to critique Dr. Ginn's analysis. Do you know what he did in his expert report? He didn't critique the use of real-world prices. And he admitted that at trial on the stand. And I can give you that site if it would be helpful to Your Honor. But that's very important because it makes sense that we would utilize the real-world pricing information when it's available because that's the best information about what's actually happening in the marketplace. And the only variable that we dispute is, again, the amount of the generic penetration. Now, Dr. Ginn's testimony was not just found to be reliable. He was relied upon by Judge Martinotti in ultimately determining that Sandus lost $137.2 million in lost profits. Now, this is very interesting. ZF Meritor was a very different case. ZF Meritor, we had a one-page forecast that was an internal document. But the expert had no idea who created it, how it was created, what was created, and didn't do anything, this is critical, to validate that forecast. Not so with Dr. Ginn. He extensively scrubbed it. His expert report was over 100 pages long. And it talked about exactly why he believed that the forecast that Rare Ginn had created, it was the most recent in time to the launch. It was one that, again, didn't produce the highest damage. He looked at over two dozen forecasts. And he explained to Judge Martinotti exactly why. Now, in ZF Meritor, the judge found that it was Dawbert and, again, excluded the testimony of the expert. That's not what happened here. Not only did Judge Martinotti not exclude Dr. Ginn's testimony, he decided that it was more reliable, more credible, and factually made a whole lot more sense than Dr. Nicholson's expert. This is entirely apples and oranges. Dr. Ginn did a very robust job. And if you review his testimony, he explained precisely why it made sense to utilize that forecast. He showed his work. Now, I want to talk about the loss-profit issue, if I may, just for a few brief moments, because that is the one area on the breach of contract claim where we contend that the district court did err. So, again, the district court finds after a three-day bench trial, footnote 10, he makes very clear that he reviewed all of the evidence, additional testimony, additional documents that UTC wanted to put forward, and he decided that that would not change his opinion. It was a significant time that the court spent. And he determined after all that that Sandoz suffered $137.2 million in lost profits. But then he reduced that award to just $61.6 million in damages because Sandoz and Rare Ginn had a collaboration agreement with a profit share. Now, some background. Sandoz partnered with Rare Ginn because Rare Ginn was an expert in the space. Rare Ginn invested $20 million. It's very important. Rare Ginn invested $20 million, and then it was entitled to a split of the profits, 80-21st and then 50-50 later. Sandoz is also required to share any lost-profit award that it receives in this litigation with Rare Ginn. That is at Appendix 11-070. Now, the question, the legal question before the court is whether or not profit-split claimants to an investor should be treated as an avoided cost. And this is an issue of first impression under New Jersey law, and it's an issue of first impression for the Third Circuit. We haven't found anything. First, Judge Martinotti erred when he took that haircut for two reasons. One is that Sandoz didn't avoid anything. One is that what? I'm sorry. Beg your pardon? I didn't hear what you said. You said one is that. One is that Sandoz did not avoid anything. Sandoz is required to share the lost profits award with Rare Ginn. That means that Sandoz's damages award, which Judge Martinotti made, was cut in half by the court, and then it's going to be cut in half again when Sandoz shares that damages award with Rare Ginn. Now, Your Honor, that's bad policy. That's bad law. And it means that ultimately Sandoz isn't being made whole as a result of the breach of contract case, and it means that UTC, the breaching party, is getting a windfall. Now, every court that we've found to address this issue of profit splits has found that they're not avoided costs, and we cite those three cases, Pencro Associates, Cruz Connections. There's the Conestoga case, and I think an analogy might best illustrate this to the court. It's a husband and wife. They have a business. Let's say it's a law firm, and they're in business together, and the unthinkable happens. They get divorced. In the divorce, they're supposed to split profit 50-50. The husband gets 50%. The wife gets 50%. The wife continues along, and ultimately there's some breach of contract dispute, and the law firm loses $100 million, and the wife brings the claim on behalf of the law firm, and ultimately that law firm should be able to get $100 million. Why? Because the $50 million that would be paid to the husband out of the profit, those are not avoided costs. Those, again, are the only way to make the enterprise whole is to give the entirety of that back, and that's exactly what should happen here, Your Honor. Now, the district court characterized a profit split payment as an avoided cost. This has huge implications for investor situations like the one that's presented here, and really a profit-sharing payment isn't an avoided cost because it's not a variable cost, and that's what each of the three cases that I talked about described. They say exactly why, again, when we think about avoided costs, somebody could have $50 million in revenue but zero in profit. That means Raritan gets nothing. It doesn't directly correlate necessarily with the sale, and so as a matter of law, this court should reverse and, again, remand, and consistent with Judge Martin on his factual findings, we find that Sandoz is entitled to recover the full amount of its lost profits, which is $137.21. If we were to reverse on summary judgment, what happens to the evidentiary and damages award issues? This is for the breach of contract claim. If you reversed on the breach of contract claim and found that 11B isn't clear and unambiguous? There's two plausible ways of looking at this, and, therefore, it would preclude summary judgment. It needs to be sorted out at trial. Ultimately, that wouldn't change the amount of damages that Sandoz suffered as a result of UTC's breach, so I suppose then at that point – Wouldn't we have to – there's various issues brought up with respect to damages, and if we were to disagree with Judge Martinotti on any of those, that would call for a redo, right? I think that that is correct, Your Honor, and I think it would be important to give guidance to the court in terms of how that should be done. I will say, though, given the language in 11B, it's clear, it's unambiguous, it's unassailable. I struggle with the idea that UTC's conduct to buy up all those cartridges and then restrict them for use with remodeling on the eve of generic launch can't be decided to be inimical to Section 11B. It is so clear. It is so – and, again, the other provisions that UTC tries to sort of gerrymander on there, they're unremarkable. I think maybe the best analogy is a non-solicit clause. If you have a situation where you have a non-solicit clause, you're essentially agreeing not to call up and poach somebody's employees. Well, that doesn't mean you get a right to the employees. That doesn't mean that necessarily the employees are going to stay. What it does mean is that you're not going to interfere with that relationship. That's exactly what happened here. Sandoz didn't get a right to the delivery devices, the proprietary pumps and things that UTC had. But what they did get was a promise, a broad promise, that UTC wasn't going to do anything to rig the playing field. That doesn't make Sandoz a free rider. That doesn't make UTC a guarantor of Sandoz's success. What it does mean is that on the eve of the launch, they shouldn't purchase the only cartridges that are available, restrict those for use with remodeling, and then when, of course, Sandoz can't come to market and serve these patients for more than two years, say, we haven't breached the contract. I'm happy to answer any other questions your Honor may have. Thank you. Thank you. Good afternoon, Ms. Hartnett. Good afternoon, and may it please the Court, I'm Kathleen Hartnett on behalf of RareGen, addressing the antitrust arguments, which are also on behalf of Sandoz. Those are brought by both of those plaintiffs. I might just, if I may, address a couple of points that came up in the argument, UTC's argument, and I'll move on to my affirmative presentation just to make sure we're clear. So there was some reference to the UTC needing to take on the cartridges because they were burning through them or the patients were burning through them. They had to service their own clients. Yeah, we're not aware of that being in the record, and I think that the record speaks to it. There's not record support for that notion, more than just that there was a cartridge demand. But didn't UTC have genuine worries about cartridges being diverted for medications other than for breast milk? So to the extent that that was the concern, your Honor, that was addressed by the 2016 and 2017 agreements, and so it really is a question of whether the 2019 agreement served that interest. There's nothing in the record to support the notion that there had been some outbreak of use. Really the only thing that happened was that it became clear in December of 2018 to UTC that they were on the eve of launching the generic. I also just wanted to focus on the point about the question. I think my colleague may have cleared this up, but as to whether there was a cartridge discontinuation, I think there was some reference in UTC's presentation that we learned about the cartridge discontinuation sooner than 2019. I didn't go to the trial here, so I know it's a lengthy record and want to make sure I find this document to be the most clear. It is the JA5341, and that's the discontinuation notice from Smith in 2015. That was sent to UTC, of course, not to Sandoz and Mergen, but there it made clear that it was going to be a discontinuation of the pump, but that the cartridges were going to be available for at least three years. Just in terms of what a reasonable market participant would have thought during the period of time after that discontinuation notice, and it wasn't just that Sandoz and Mergen were relying on just hope. It was that they also went to the specialty pharmacies and received the assurances, but there was a reason to believe the cartridges would continue to be generally available, not just for UTC's product, but for other products as well. Then I finally just wanted to address, well, I think there were several references in the presentation to what would be reasonable or not. Was this a reasonable time? Were these reasonable actions? We would respectfully submit those are precisely the types of inquiries that should have gone to the jury on the antitrust claim. The district court did at the JA67, so in part of his opinion, recognize that under Supreme Court precedent, it is the fact finder that weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as unreasonable. And so to the extent that there are questions about was this a reasonable time or not, were these actions reasonable, I think we certainly have at least a disputed record there to go to the jury. On the time point, I did want to directly address Qualcomm in continental cases that UTC cited, both in its brief and in argument. Qualcomm does not stand for the length, in this case, somehow being dispositive. There, in the Ninth Circuit decision, there was an under one year delay, and so on that record, the court felt that that was not enough. We're here dealing with 27 months, so there's not some bright line even under Qualcomm that would apply here. And then in continental airlines, I think they also referenced, in fact, there the summary judgment was denied. There was a notion there that the alternatives weren't actually realistic. And so, again, that was a case that went to the jury. So our fundamental objection with the district court's opinion on the antitrust claim is just for whatever reason, throughout on all three key issues, substantial foreclosure, anti-competitive effects, and on pro-competitive justifications, the district court put itself in the role of fact finder and essentially made findings that really should have been subject to jury decision. I don't want to belabor the point, but just to make sure I direct you to what we think are actually the statements at issue, I think on substantial foreclosure, the sort of ultimate resolution of a factual question by the district court was at JA81 where they said the record shows that Sandoz was not foreclosed from contracting with Smith or other manufacturers to secure cartridges for its own use. That's on JA81. And that was sort of a finding against us as opposed to recognizing the disputes that we've been having here as you've questioned both counsel. Was there actually a reason for Sandoz and Mergen to be looking for a different cartridge supply in the first place when they had the assurances? And even if there had been a reason for them to look, was Smith actually a realistic option? We had evidence in the record that made clear that it was not realistic or reasonable to require us to look for options when we thought we already had one and did our diligence. It also was not realistic. And I would just add one thing to my colleague's otherwise exhaustive presentation about the Smith issue. There also, in addition to the resin supply, was the issue of the FDA modification of the label. So even if we had been able to get a license from Smith, which had its own issues with the resin supply, we would need Smith's cooperation to actually be able to bring that to market because Smith's – I think you may have gleaned this from the briefs – but Smith's pump had a restriction on what cartridges could be used, and that would need to be revised. Is that the 510 application, the 510K application? Oh, sorry? Is that the 510K application? Yes, exactly. And so I think the key point there – and, again, ignored, unfortunately, by the district court in the antitrust summary judgment ruling – Smith's did not cooperate to provide that support in front of the FDA until we sued Smith and they settled with us. That was only after that settlement that they agreed to go to the FDA and help us get access to their pump via the revision of the manual. Let me ask you about these state law claims. There's transparent and unfair trade practices. The district court's analysis was thin at best, basically saying, well, same analysis in antitrust. Could you speak to your position with respect to those two claims? Yes, Your Honor. I mean, I think we do think that the antitrust ruling is flawed enough on its face just in terms of resolving the factual disputes, and the court hinged that whole – the rest of the state law claims on the part of – Very much so. Right, and the antitrust claim would be enough to underlie some of those claims, the wrongful conduct that we would need for tortious interference, the unfair practice that we would need for the other claims. So to the extent that, as we think the court should, reverse on the summary judgment for the antitrust claim, that would flow through to the other claims, especially the state restraint of trade. The main couple points I would make there, though, is on tortious interference. The one thing that is different about that is it's about harm to competitor, not to competition. And we have both here. I think that's another place where the district court may have just sort of missed the bigger picture, which is that, of course, Sandoz was harmed and Redgen were harmed. So was the market, as it was deprived of a much lower-cost generic for 27 months for a product that was not readily substitutable. But we would say for that one, tortious interference both flows from the antitrust but also has the separate notion of being a competitor-based harm. And for the unfair trade practice, it doesn't need to rise to the level of an antitrust violation under the relevant statute. So those would be the reasons why we think a reversal from the antitrust would flow through, but there independently would be grounds to reverse on that. I guess I would also just briefly point, I think we've, again, I don't want to retread ground, but I do think that the court's cases, particularly Z.F. Meritor, Densley, and LePage's, all really support our position here, which is that these are questions for a jury. And in both Z.F. Meritor and LePage's, they upheld a jury verdict. So that shows that the case went to trial on a record of whether or not a exclusive dealing situation that slowed a rival's expansion, which, I mean, that certainly seems like a pretty apt term for here. Slows a rival's expansion was the language in Z.F. Meritor. That's certainly what happened here. And then likewise in LePage's, I think another important lesson from that case is you look at what the efficient competitor would do, not foreshadowing that the rival might actually engage in unlawful conduct, but what would the efficient competitor do once the restraint is in place? And here, as my colleague covered, the rare gen in Sandoz, surprised to learn in January 2019 that they did not have access to the cartridge they were relying on, quickly went into action and did that as quickly as possible. So I think I've covered the main points, but I would just also direct the court to the, I would say the core problem with the anti-competitive effects prong was that JA84, that's where the court resolved against us as a factual matter that we. But the district court there found no evidence of reduced output, increased prices, or decreased quality of the subcutaneous proprastanol. Correct. In the U.S. after UTC restricted the cartridges. Yes. But a monopolist that successfully wards off a rival through anti-competitive tactics might not need to reduce output, increase prices, or decrease quality. That's correct, Your Honor, and I think there's two problems there, which is one is an issue of law, that it doesn't actually require an increase in price under the case law. You can just also retain super competitive prices, and so that's exactly what happened here. Rather than have a price reduction from the incumbent that you would expect, it didn't go down as much, and we actually had expert testimony in the record. I think it's cited in our brief, but the experts. Those deal with direct anti-competitive effects, but then you would go to indirect, and the court didn't mention or conduct any separate analysis of indirect evidence, did it? No, Your Honor, that's an additional problem with the effects analysis. One is that it's countered to the record with respect to direct effects, and the two is that it ignored that we also can show that through substantial foreclosure and market power, and there was at least a jury question on that as well. And then finally, for the third problem, which is pro-competitive justifications, again, we believe that the court resolved that against us rather than allowing a disputed issue to go to trial, and the court said on JA85, that's where the key finding is there, that according to the district court, the record here sufficiently establishes pro-competitive justifications for the 2019 restriction. It was a very short analysis, and it was actually in conflict at some level with the finding it had earlier made in the ruling that the 2019 gobbling up, in my colleague's words, was actually the key end to the scheme. Rather than that, it kind of looked at 2019 as just part and parcel in the antitrust analysis of what had happened before, where UTC was trying to ensure it had a supply of pumps and cartridges from Smiths, but what happened in 2019 was different in kind. It has to be looked at differently because there, and I think by the record makes clear, I think it took at least, even if you assume that the 2.1 was actually a sign of what UTC needed, even though it didn't have a right to those under the agreement, it was 2.8, as your Honor pointed out, cartridges that Smiths made without telling UTC, Smiths actually went and got additional resin and made those. Eventually, UTC knew that, and it knew to gobble them up, but the only reason to do that, it didn't need 700,000 extra cartridges for itself. It was doing it on the eve of launch to be able to prevent us from getting it, and as the courts- Is that how many there were, 700,000? Well, I think if you look at JA6553, that's the agreement between UTC and Smiths, where's the 2.1 million figure. Again, we dispute that that was like theirs, but that is what they agreed to by kind of guarantee, essentially, if Smiths wasn't able to sell that, but then they could produce 2.8 million, and that's at JA5300-01. So in other words, basically there was hundreds of thousands of cartridges available for use other than UTC. Even under UTC's own view of that agreement, what it did in 2019 was take them so that we couldn't use them. Would you address the- UTC gave a number of justifications on the antitrust claims, that there were justifications for what it did, and I don't think you dispute that their prepayment of 23 million for the pumps and 4 million for the cartridges was a but-for cause of Smiths producing more pumps. It stands to reason UTC would want to reap the benefits of that investment, would it not? So I think it's important, and my colleague pointed out, Smiths had been making these cartridges over a long period of time, so this wasn't like UTC's cartridges, they were Smiths' cartridges. When the end-of-life notice came in 2015, we don't dispute that at that point in time, UTC had reason to want to make sure it assured itself that it was getting the supply it needed from Smiths, and that seems to be the reason for the 2016 agreement. And to the extent 2017 they wanted to up the number due to some worry about going to other places, again, we're not disputing that here, that's not being anti-competitive action. But I think it's really this court said in Densply, we may assume that Densply won its preeminent position by fair competition, but it doesn't permit it to maintain that monopoly by unfair practices. That really is on the force here, because what happened was, even if 2016 and 17 were about ensuring a supply, 2019 was not about that, and there really was nothing in the record to show that, to support that view, that suddenly there was a need other than boxing us out. But at a minimum, we would say that's where you have to go to a jury to figure out. Weren't they even worried only in 2019 that cartridges could be diverted to uses other than proprescinol? That was a longstanding concern, which is why it was already accounted for by the 2017. I keep mispronouncing it. How do you pronounce it? I might be the wrong person to ask, but I'm not sure. Proprescinol? Proprescinol, I think, if Mr. Kent can correct me if I'm wrong. Sometimes I think I'm putting the emphasis on the wrong syllable. Exactly. No, Your Honor, the record doesn't support, and this is where we get to at least a tribal question of fact, as to whether or not the gobbling up on the eve of the launch, when there had not been a need for that sooner, that that was clearly, in our view, not a good faith justification for that. Again, the point being that the concern about uses beyond the use for these patients, for this discrete universe of patients, had already been accounted for by the earlier restrictions, 2016 and 17. 2019 did something completely different in kind. It kind of went from a heavy-handed dominant market player to an actual coercer and monopoly actor. So we would request that the court on the antitrust claim, it should be reversed and remanded. There should be a trial on the antitrust claim. There should be a trial on the state law claims. And the record supports, at most, at a minimum, a chance for the jury to hear our case. Thank you. Mr. McLeod? Why don't you start with the language in 11B? Yes, Your Honor. And the word distribution. They seem to put a lot of weight in that. That's right. I think Mr. Kent suggested that our reading of the agreement essentially makes 11B meaningless. I don't think that's correct. We read 11B in the context of 11A and the overall patent dispute. I think this goes to Judge Amber's question about why would they reach beyond the patent dispute to this very broad right and responsibility. And we don't think they did. We think what they were doing in 11B is making sure that UTC could not wield its patent rights in other ways they had not already precluded in 11A. So 11A says that we can't sue the Sandoz releases, who are defined in Section 5 of the agreement, with Sandoz and affiliates and other Sandoz-related companies. We think that what 11B does is says a company like Rare Jane, for example, we can't sue them for patent infringement either as a means of blocking Sandoz launch. So we agree that with respect to those – Isn't that an issue of fact, what it means? I agree it's an issue of fact. That's why we think that summary judgment was inappropriate on this record. We think that there is a plausible interpretation of the agreement that is narrower than the very broad interpretation that the district court adopted under which essentially anything we do that Sandoz doesn't like, that they claim interferes or delays them, is a breach. And so to admit on them, I think there was a jury issue on that question. With respect to the testimony of Dr. Jenna, I just want to note that the document that Mr. Kent referred to that talks about 26% of doctors waiting for the subcutaneous, that document was not admitted for its truth. No one who testified at trial knew anything about that document. And Dr. Jenna didn't even rely on it in his testimony. And so it couldn't be the basis for finding that the HALO effect was foreseeable. And again, I want to reiterate, the district court did say that the testimony showed that it was not foreseeable, that there would be an effect on the IV sales. And that was consistent with the testimony of Sandoz's own witnesses. Their former vice president of marketing testified that they had no idea whether there would be an impact on the intravenous from a restriction of subcutaneous. And in fact, the rare gene forecast that was the centerpiece of Dr. Jenna's analysis predicts the exact opposite. It predicts that IV sales would be higher in the absence of subcutaneous, which is what you would expect. If somebody brought this issue up and it was brought up to you cold, and it's like in a classroom and somebody said, the professor says, well, you've got this contract. And it says you're not going to delay in any way the generics attempt to launch. And you're not going to interfere in any way. And then it comes 2019, and for the subcutaneous administration of this particular drug, the market of cartridges is wiped out. It's held by the person who previously agreed in 2015. Wouldn't the blink response be, hmm, this needs to have more investigation? I may be, but I think that that's the investigation the jury has to do. The jury has to read this language and decide whether there actually was a breach. One other point I should make about the contract language is Mr. Penn suggested that 4L, 7A, and 13B are limited to licensing arrangements. That's not what the agreement says. I'll just point to 13C in particular. It says nothing in this agreement shall be construed to grant any right to any third-party proprietary technology, any other pump or delivery system, or any other form of preposterous. That's very broad. It clearly goes beyond simply granting a license to this technology. And at a minimum, I think a jury could credit our argument that this was a narrowly focused agreement that was intended to permit competition, but not to grant any rights to these sorts of delivery devices. My other point I'd like to make about Dr. Jenna and Judge Ambrose, you asked about this, is the pairing of the real-world prices with the hypothetical prices. And as you pointed out, Dr. Jenna gave no explanation for doing that, other than that the real-world prices were available. Well, the hypothetical prices were available too. The rare-gen forecast specifically predicted what the prices would be in the hypothetical world. And it makes perfect sense to be consistent about that because the rare-gen forecast's sales predictions are predicated on lead yield. You will sell a lot of products at a low price. Instead, what happened was Dr. Jenna predicted they would sell a lot of products at a very high price, and that is inconsistent economic pairing. Our expert did not agree that that was appropriate. What our expert, Dr. Nicholson, said was you could pair real-world prices if you also looked to real-world sales data, and that's exactly what he did in his analysis. With respect to the promotion agreement, I actually really liked Mr. Kent's husband-and-wife hypothetical because that illustrates exactly the flaw in their argument. Sandoz and rare-gen are not married. And, in fact, their agreement expressly says they are not forming any sort of partnership or joint venture. They are independent contractors to each other who stand as strangers, essentially, except for one limited right. Rare-gen has the right to conduct detailing, to essentially call doctors and say you should buy this drug. But even that limited right is subject to restriction by Sandoz. Sandoz is the one who ultimately sells this drug. And when Sandoz was figuring out how to account for its obligation to rare-gen, Sandoz said these are costs that we would have incurred but for the partnership with rare-gen because what rare-gen is doing is essentially making sales, and so it gets a sales commission. Now, it's true that they didn't structure the agreement exactly like a traditional sales arrangement where you would get, you know, per dollar per sale, but it's pretty close to that. My final point on the promotion agreement is the cases that Mr. Kent is referring to and that are cited in our brief are totally inapposite. Those are cases where you have a pass-through entity where all of the money flows. And, of course, in that scenario, you wouldn't say because you have to give your money to your shareholders, you don't get any money. That is not our argument here. We acknowledge that if there was a proper damages award, Sandoz would get some of the money. All we're saying is that they would only get the amount they would actually get in the real world, which was not $160 million. Finally, with respect to the antitrust issues, I'd like to clear up something about the cartridges. You know, Ms. Hartman suggested there was no evidence in the record that we needed all of the cartridges, but I think that is inconsistent with the very clear evidence. I would point in particular to the deposition of Nathan Walker, who was a Smiths employee. This is at Appendix 5281 through 5284. And he explains that Smiths approached UTC to purchase more cartridges because UTC had a need for all of these cartridges. UTC's founder, Dr. Rothblatt, testified to the same thing. Her deposition is Appendix 4159 through 4160. So it was clear, and I think the record bears this out, that UTC needed all of these cartridges. This was not a scenario where UTC was just sitting on the cartridges in a warehouse to make sure they were away from Sandoz. We actually needed these cartridges in order to be able to deliver our own product to our patients. Ms. Hartman referenced the ZF Meritor, LePages, and Dent Supply cases. I think those cases are clearly distinguishable because in each of those cases, the evidence was that there was only a hypothetical alternative available. There was no actual possibility for competition. And again, the record here is very different. I have listed a couple of times what we think were the three options that were available. The court only needs to credit one of those. And I think the one that is indisputably available to them is the one they actually pursued, a partnership with Care Life, a competing manufacturer that would get them on the market. Now, it is true, I think as Ms. Hartman suggested, that there was some lag in time. We did not allow them to get onto the market immediately. It was two years. But cases across the country that we have cited, like the Medtronic MiniMed case, the EpiPen case, like the Qualcomm case, say that even if there is some amount of time that passes before you can compete, that is not foreclosure because the focus of the foreclosure analysis is on whether there is a possibility of competition. And here, competition is not only possible, it is reality. They are actually competing today and they are competing in a way they could have competed with us in 2015 or in 2019. So that dispute, which is relevant for the breach issue, is not relevant for antitrust claims because you can assume I'm wrong. You can assume for purposes of the antitrust claims, they had no reason to do anything until 2019. But even at that point in 2019, they had the option to compete. And so there can be no foreclosure and therefore no antitrust claims. Thank you. Thank you, counsel. We're going to ask that the transcript be prepared and that counsel split the costs. Yes, your honor.